UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-CR-47-PPS |
| | ) | |
| CHARLES GOULD, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

A jury convicted Charles Gould of conspiracy to possess with intent to distribute or distribute 280 grams or more of cocaine base. Gould seeks either a judgment of acquittal or, in the alternative, a new trial based on several areas he identifies as creating reversible error in his trial. FED. R. CRIM. P. 29(c) and 33 [DE 1131.] After careful consideration of each of Gould's arguments, I find that none of them provides a basis for overturning the jury's verdict.

### **Background**

Antonio Walton was the head of an elaborate crack cocaine operation at three locations in Gary, Indiana. Keana Porter, who was Walton's sister, was in charge at a location on Massachusetts Street while Yahtzee Harris and Ben Hickman operated at other locations. [Tr. 317, 547, 733-34.][1] Walton delivered crack cocaine to Porter, Harris, and Hickman through multiple couriers including Charles Gould who went by the

---

[1] The Transcript in this case is found in the record at Docket Entries 865-870 and will be referred to throughout as [Tr.] followed by the page number shown in the top right hand on the Transcript page.

nickname "Mooney." [Tr. 522, 547-48, 767, 924.] Gould principally worked with Porter at the Massachusetts Street location. [Tr. 767.] Working out of that location, Keana Porter would repackage crack cocaine into small bags in groups of 20 or 30, called a "count." [Tr. 759-60, 804-05.] She would hand these "counts" to Gould and others through her bedroom window. [Tr. 741.] Gould and others would go next door to a "trap house" where they would sell crack cocaine and provide users a place to smoke it. [Tr. 742-3, 685-86.] Afterwards, Gould would return to Porter, cash in hand. [Tr. 741.] She stored the money until the end of the day; she would then use a courier, sometimes Gould, to send the money back to her brother, Antonio Walton. [Tr. 769-72.] Porter kept track of these transactions in ledgers, which she destroyed once the booklet was filled with entries. [Tr. 741.] The operation involved numerous roles including lookouts, dealers, couriers, enforcers, cooks, and others.

After several months of police surveillance, controlled buys, and investigation, police executed a series of search warrants recovering drugs, drug paraphernalia and guns. All of which led to the arrest of Walton, Gould, Porter, and eighteen others at three locations, all of whom were suspected of participating in the ongoing conspiracy. In a second superseding indictment Gould was charged (along with a number of other defendants) with one count of conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine and 280 grams or more of cocaine base. [DE 67.]

At trial, the government presented testimony from many cooperating co-

defendants including Keana Porter, Courtney Crouch, Christopher Green and Ben Hickman. Porter and Courtney Crouch (who was another courier and dealer for Walton), testified in detail about Gould's role in the conspiracy. For example, there was evidence of Gould and Crouch exchanging text messages regarding another dealer who came up short after selling crack cocaine. [Tr. 1003-04.] This led to Crouch and Gould physically searching the other dealer for the missing cash. *Id.* Gould also kept his gun at Porter's house and from time to time would ask for the gun. [Tr. 747-749.] Gould acted as a lookout, sending Porter texts when police were in the area. [Tr. 870.] He also acted as security by preventing others from knocking on her bedroom window at night looking to buy drugs. [Tr. 853-54.] The government also introduced in evidence one of the drug ledgers maintained by Porter recovered during the execution of a search warrant. The ledger covered a two-week period. (As mentioned above, earlier ledgers were routinely destroyed). The ledger showed Gould buying counts on five different occasions.

In the end, three defendants proceeded to trial: Antonio Walton, Telisha French (another one of Walton's sisters), and Gould. Following a six-day trial, a jury convicted Gould and Walton of conspiracy to possess with intent to distribute or distribute a controlled substance. French was acquitted. [DE 816.] As to the weight of the drugs involved in the conspiracy, the jury found there was 280 grams or more of cocaine base to be attributed to the conspiracy. *Id.* Gould now seeks either an acquittal or a new trial. [DE 1131.]

**Discussion**

### A. Rule 29 Motion for Acquittal

A criminal defendant may request an acquittal "[a]fter the government closes its evidence or after the close of all evidence . . . of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29. Under Rule 29, the evidence must be viewed in the light most favorable to the government. *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). Challenges to the sufficiency of the evidence become more difficult after a jury verdict because the jury found the evidence sufficient. To succeed, Gould "must show that 'based on the evidence presented at trial, no rational juror could find guilt beyond a reasonable doubt.'" *United States v. Jones*, 993 F.3d 519, 527 (7th Cir. 2021) (citing *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009)); FED. R. CRIM. P. 29(c). I will not "intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Gould faces a "nearly insurmountable hurdle" to show that the evidence could not support the guilty verdict. *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014).

The government had to prove beyond a reasonable doubt that Gould knowingly and intentionally joined a conspiracy to distribute or possess with the intent to distribute cocaine base, and if the jury answered that question yes, the jury then had to make findings on drug quantity. The jury ultimately found Gould guilty and attributed

-4-

more than 280 grams of cocaine base to him. [DE 816.] Gould argues that he merely participated in a buyer-seller relationship with Porter and that the government failed to prove that he was part of a drug conspiracy beyond a reasonable doubt. He believes that the quantity and quality of proof was "too scant to support Gould's conviction of the § 846 conspiracy." [DE 1131 at 7-8.] Gould claims that Porter's testimony alone is not enough to convict him. *Id.* at 9.

"[E]vidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction. Instead, [there must be] evidence of an agreement to advance *further* distribution – beyond the initial transaction . . . [which may be proven] through circumstantial evidence." *United States v. Hopper*, 934 F.3d 740, 754 (7th Cir. 2019) (internal quotations and citations omitted). Repeated transactions on credit "can be compelling circumstantial evidence of an agreement to distribute drugs because it demonstrates that the defendant had knowingly thrown his lot in with other members of the conspiracy." *Id.* at 755 (internal quotations and citation omitted). Looking at the totality of the circumstances, I consider all of the evidence of the conspiracy and assess whether the jury reached a reasonable verdict. *Id.*

Gould contends that, at most, he interacted with Porter in a buyer-seller relationship, and that while she testified Gould would routinely buy drugs from her several times a day, the ledger only listed Gould making five purchases. It's worth noting at the outset that Gould was free to argue the buyer-seller point to the jury. The jury was specifically instructed that people who have a buyer-seller relationship are not

-5-

necessarily co-conspirators. [DE 810 at 24, Court's Instruction No. 23.] But in all events, the government provided sufficient evidence for a reasonable jury to conclude that Gould participated in an agreement to distribute crack cocaine, and it was more than just a buyer-seller relationship. During the six-day jury trial, the government presented evidence that Gould wore multiple hats in this conspiracy, including: dealer, courier, lookout, and enforcer. Gould acted as a dealer when he routinely sold crack cocaine at the house adjacent to Porter's and returned to Porter with the proceeds from these "counts." [Tr. 735-37, 767, 939.] Gould also acted as a courier transporting crack cocaine from Walton to Porter. [Tr. 924.] He also took the proceeds from the day's drug sales back to Walton. [Tr. 770-71.] Porter's testimony is not the only evidence against Gould. The government also presented one of Porter's ledgers into evidence, which shows five instances when Gould purchased "counts" from her.

What's more, Gould's daily drug dealing at the Massachusetts Street location was done on credit. [Tr. 924, 926.] Repeat transactions on credit "can be compelling circumstantial evidence of an agreement to distribute drugs because it demonstrates that the defendant had knowingly thrown his lot in with other members of the conspiracy." *Hopper*, 934 F.3d at 755 (internal quotations and citation omitted). Here, the reference in the ledger to Gould's five credit transactions along with Porter's testimony that Gould would buy from her several times a day supports Gould's involvement in the conspiracy. Finally, his argument that five transactions in a single ledger cannot amount to involvement greater than a mere buyer holds no weight. That was an issue

for the jury to decide. Gould is listed in the ledger as receiving multiple "counts" and returning the money after the drugs were sold. [Tr. 939.] The fact that there was only one ledger was fully explained by Porter when she testified that she routinely discarded the ledgers after they were full. [Tr. 906.] She also testified that Gould received crack cocaine from Walton and returned with money without ever dealing with her. [Tr. 941.]

There was also evidence that Gould acted as a lookout, sending Porter texts when police were in the area. [Tr. 870.] Gould also kept his gun at Porter's and from time to time would ask for the gun. [Tr. 747-749.] He acted as security by preventing others from knocking on her bedroom window at night looking to buy drugs. [Tr. 853-54.] Finally, there was evidence that Gould acted as an enforcer. He and Crouch dealt with another dealer when that dealer came up short after selling crack cocaine. Gould told Crouch via text message about the problem and they took the dealer inside searched him for the missing cash. [Tr. 1003-04.] Porter's and Crouch's testimony, text messages, and Porter's ledger showing multiple buys by Gould substantiate that Gould was more than just a customer in this conspiracy.

Gould also argues that the evidence of only five recorded transactions could not support the conclusion that he engaged in multiple, frequent, large-quantity purchases with Porter. [DE 1131 at 9-10.] Unfortunately for Gould, the "the law does not limit his guilt to the quantities he sold alone, but rather, to the entire operation [and] may be found guilty of offenses committed by co-conspirators, even if he neither participated nor had knowledge of the substantive offense." *United States v. O'Leary*, 957 F.3d 731,

733-34 (7th Cir. 2020) (citing *United States v. Pisman*, 443 F.3d 912, 913 (7th Cir. 2006)). Ten ounces of crack cocaine amounts to 280 grams. [Tr. 528.] The drug sales from one location amounted to one and a half ounces per day. [Tr. 570.] After less than ten days, one location would satisfy the 280 grams amount. Police surveyed and made controlled buys over at least two months, which is more than sufficient to reach the 280 gram quantity of which Gould is convicted.

Finally, Gould attacks Porter's credibility and challenges that her statements alone cannot convict him. First, the government produced evidence other than Porter's testimony to link Gould to the conspiracy, including the testimony given by other witnesses and corroboration by independent evidence. Gould had plenty of opportunity to attack the credibility of witnesses and evidence at trial. However, the jury weighed the evidence and found him guilty beyond a reasonable doubt. Gould essentially wants me to replace the jury's credibility findings with my own and discredit witnesses the jurors found to be credible, and I decline to do so.

In sum, Gould's level of involvement in this conspiracy was more than a mere buyer-seller relationship with Porter. The government provided substantial evidence at trial which could easily lead a reasonable jury to conclude, beyond a reasonable doubt, that Gould was involved in this conspiracy. Jurors heard directly from Keana Porter and Courtney Crouch as to Gould's involvement in the conspiracy. The government presented evidence in the form of text messages and Porter's ledger. The jury had ample evidence that Gould was an integral part of the conspiracy to distribute crack

cocaine. A rational trier of fact considering the testimony and the corroborating evidence could have easily found Gould guilty beyond a reasonable doubt. Therefore, I deny Gould's motion for acquittal.

### B. Rule 33 Motion for a New Trial

Gould also seeks a new trial. I may "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33; *see United Green v. Junious*, 937 F.3d 109, 1013 (7th Cir. 2019) (providing that only if "no reasonable person would agree with the trial court's ruling and the error likely affected the outcome of the trial" will a new trial be granted). In contrast to a motion for acquittal, I am not required to view the evidence in the light most favorable to the government but must independently consider the evidence presented. *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004), *vacated on other grounds*, 546 U.S. 12 (2005). Gould's burden is still a heavy one—to show that the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice. *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).

#### 1. Co-conspirator Statements

Gould first argues that the court erred in admitting co-conspirator statements. Hearsay is an out of court statement used to prove the truth of the matter asserted. FED. R. EVID. 801(c). A statement is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). Admission of co-conspirator statements is

-9-

proper when the government proves "by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy." *United States v. Santiago*, 582 F.2d 1128, 1134-35 (7th Cir. 1978). "[T]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or the participation in it . . . ." FED. R. EVID. 801(d)(2).

Gould only challenges one co-conspirator statement which he says warrants a new trial. [DE 1131 at 12.] It's a curious argument since I excluded the hearsay statement from evidence. Here's how the issue developed at trial. The statement in question involves a call placed from the Lake County Jail that was initiated by Antonio Walton to Yahtzee Harris. [Tr. 1087.] Walton evidently instituted the call but before the call connected, Walton had a third party inside the jail do the actual talking. *Id.* There were some problems with the government's effort to introduce the recording of the call into evidence including the fact that it was not included in its *Santiago* proffer and there was no evidence that the third party was even part of the conspiracy. [DE 1113 at 12.] So, I excluded from evidence the content of the call. [Tr. 1089-90.] It is therefore difficult to discern what Gould is arguing (or how it was even prejudicial to his case).

Gould also vaguely claims that the co-conspirator statements fail to link him to the conspiracy and that his involvement with Porter cannot link him to the conspiracies at Harris's and Hickman's locations. For starters, the jury was specifically instructed to consider Gould's argument that there were multiple conspiracies afoot. [DE 810 at 24,

Court's Instruction No. 24.] He argues that the activities at each location were separate and distinct from each other but does not specifically indicate which co-conspirator statements he is challenging. Here, I agree with the government that all three locations and those who ran them were all part of the same overarching conspiracy to sell crack cocaine. At least a jury could so find. This was a classic hub-and-spoke conspiracy, where Walton was the central figure, and with Gould and other dealers serving as spokes, and the rim connecting the spokes is "an agreement to further a single design or purpose." *Brasher*, 962 F.3d 254, 262 (7th Cir. 2020) (internal quotation and citation omitted). The government only needed to prove that Gould knowingly joined an agreement to distribute crack cocaine, *United States v. Green*, 648 F.3d 569, 579 (7th Cir. 2011), not that Gould knew "every member of the conspiracy [or that he] participate[d] in every act of the conspiracy in order to be convicted." *Brasher*, 962 F.3d at 261-62. So long as Gould "was aware of the aim of the conspiracy" and knowingly decided to join, he may be held accountable for all foreseeable acts committed in furtherance of the conspiracy by co-conspirators. *Id.* at 262. When considering the testimony given by various witnesses and corroborated by independent evidence, there was sufficient evidence of a conspiracy that Gould joined to admit the co-conspirator hearsay statements.

In sum, Gould has not identified any improperly admitted co-conspirator statements. And the one co-conspirator statement he does specifically challenge, I refused to admit during trial. Therefore, Gould has failed to meet his burden and I find

-11-

that the government established the existence of a conspiracy and Gould's participation in it.

### 2. Remaining Arguments

Finally, Gould claims the court erred in allowing the government to make certain statements in rebuttal closing arguments. In particular, he argues that the government misled the jury by inviting them to decide the case on broader issues. Gould must prove that the remark was improper *and* the remark deprived him of a fair trial. *United States v. Jackson*, 898 F.3d 760, 765 (7th Cir. 2018). In general, allegations of prosecutorial misconduct are analyzed to determine whether they are so egregious that the defendant was deprived of a fair trial. *Id.* I review these in the context of the entire trial: whether the alleged comments or actions unfairly suggest guilt, whether the behavior was isolated or extensive, whether the evidence of guilt was overwhelming, and what curative instructions were given. Improper remarks may include appealing to the jurors' emotions, inviting jurors to consider the social consequences of the verdict, or personally vouching for a witness's credibility. *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir. 1997); *see United States v. Morgan*, 113 F.3d 85, 90 (7th Cir. 1997) (statements such as asking the jurors to put themselves into another's place or implying that an acquittal would cause reluctance or fear in future witnesses are improper); *see United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017) (remarking that the defendant should be assigned "to the innermost circle reserved for the worst of the damned). Prosecutors may draw reasonable inferences from the evidence. *Renteria*, 106 F.3d 767.

Gould takes issue with the following statements: "This [conspiracy] was the well-oiled machine that I told you about last week. It never shut down until law enforcement shut it down for good." [Tr. 1244]; "[The conspiracy] worked for a long, long time until law enforcement, through good police work, good, hard old-fashioned police work shut it down. And that's why we're in this courtroom today." [Tr. 1244]; "our criminal justice system is about holding people accountable, and it only works when those who are accountable are held accountable" and "[t]he system works when those who are held accountable are actually held accountable." [Tr. 1244.]; "Because there's something that none of the lawyers mentioned. There was a law enforcement investigation here, a thorough, hard-working law enforcement investigation. And what did those law enforcement officers do? . . . They executed a bunch of search warrants." [Tr. 1238].

Here, the challenged comments do not impermissibly express an opinion on truthfulness or credibility or appealed to the jurors' emotions. Regarding the first two comments, there is plenty of evidence in the record that the conspiracy was intricate and operated until Gould and others were arrested. There is nothing inflammatory about the conspiracy being a well-oiled machine or that it continued until police shut it down. On the same note, there is nothing inflammatory about holding people accountable for their actions. Additionally, I instructed the jurors to rely on their collective memory of the evidence and disregard counsels' statements which are not supported by the evidence. [Tr. 1059, 1259.] I do not find that the statements by the government either improperly appealed to the jurors' emotions or invited them to

consider the social consequences of the verdict.

Gould next challenges as impermissible burden shifting the government's insinuation during closing and rebuttal that the defense could have used their subpoena power to call "[Rosiland Cherry] in" to testify, that "[t]hey have the same subpoena power the government has. . . if they wanted Rosiland Cherry, they could have brought her in here." [Tr. 1233]. In other words, the prosecutor told the jury that the defendant had the same subpoena power as the government. This is not burden shifting. *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016). In any event, during trial, I specifically instructed the jury immediately after the prosecutor's statement that "the government sustains the burden of proving the case against the defendants beyond a reasonable doubt. The defendants are under no obligation to present any evidence." [Tr. 1233.] There was no error, and a new trial is therefore not warranted on this basis.

## Conclusion

Gould has failed to meet the heavy burden of showing that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt and deny Gould's motion for acquittal. Additionally, I find that Gould has not overcome the burden of showing that the verdict is so contrary to the weight of the evidence that justice requires a new trial and deny his motion for a new trial.

**ACCORDINGLY:**

Defendant Charles Gould's motions for a judgment of acquittal and new trial

[DE 1131] are **DENIED**.

**SO ORDERED on May 10, 2021.**

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
